Hand-Delivered

**FILED**
Statesville, NC

MAY - 5 2026

Clerk, US District Court
Western District of NC

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

|  |  |
|---|---|
| SHERRY WILSON,<br>Plaintiff,<br><br>v.<br><br>PARTNERSHIP PROPERTY<br>MANAGEMENT,<br>JASON BUFFKIN,<br>DREW LEONARD,<br>LISA SMITH,<br>and SABRINA WARREN,<br><br>Defendants. | Case No. 5:26-cv-104<br>MEO<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### I. INTRODUCTION

1. This is an action for disability discrimination, retaliation, and interference under the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and related state law claims. Plaintiff Sherry Wilson, a person with a disability receiving SSDI income, applied for housing at The Flats at Statesville, a LIHTC property managed by Defendant Partnership Property Management (PPM), one of the largest affordable housing managers in the Southeast with approximately 310 communities and nearly 14,000 units, participating in the LIHTC program since its inception in 1986. She was denied on the same day she applied. After she requested a reasonable accommodation, Defendants granted a credit waiver, removing the only disqualifying factor. When Plaintiff filed fair housing complaints, Defendants revoked the waiver, demanded duplicative, irrelevant, and/or unavailable documentation, and refused to process her complete application. Defendants' retaliatory conduct escalated immediately after Plaintiff filed complaints and after PPM received her 49-page legal packet on November 7, 2025, demonstrating a direct causal connection between her protected activity and Defendants' adverse actions. As a direct result, Plaintiff and her adult dependent daughter became homeless for approximately six months, suffering physical injury, emotional trauma, and the loss of irreplaceable life milestones.

# KEY TIMELINE OF EVENTS

**September 22, 2025** – Plaintiff submitted her application for a two-bedroom unit at The Flats at Statesville and provided requested documentation, including SSDI documentation and income records. Defendants issued a same-day denial citing credit history.

**September 26, 2025** – Plaintiff submitted a reconsideration and reasonable accommodation request.

**October 6, 2025** – Plaintiff filed a fair housing complaint with HUD.

**October 17, 2025** – Defendant Drew Leonard issued a written 504 credit waiver, removing the credit issue as the stated disqualifying factor.

**October 23–31, 2025** – Plaintiff repeatedly attempted to complete the process, requested a new point of contact, submitted corrected affidavits and updated income documentation, asked whether anything else was needed, and received no response.

**November 1–4, 2025** – Plaintiff filed additional complaints and sent final written notice requesting approval or denial before her lease ended.

**November 7, 2025** – PPM corporate received Plaintiff's 49-page legal packet by certified mail.

**November 10, 2025** – After receipt of the legal packet, Defendant Buffkin demanded tax returns and four consecutive paystubs from Uber and DoorDash and questioned how Plaintiff's request related to disability, despite the prior credit waiver.

**November 13, 2025** – Plaintiff sent a final reasonable accommodation and anti-retaliation notice, warning that her lease ended November 14 and she was at risk of homelessness.

**November 14, 2025** – Plaintiff and her daughter became homeless.

**November 21 and December 5, 2025** – Defendant Lisa Smith demanded additional gig-work documentation and warned the case would be closed if Plaintiff did not comply.

**February 19, 2026** – Plaintiff's medical provider documented bilateral lower extremity pitting edema, numbness in the bilateral great toes, inability to elevate legs while living in a car, and housing instability.

**March 13, 2026** – Defendants sent an "inactive/incomplete" letter despite the October 17 credit waiver and prior document submissions.

**April 14, 2026** – Plaintiff's medical provider issued a letter stating stable, private, non-congregate housing is medically necessary.

**May 2026** – Plaintiff remains homeless as this complaint is filed. The harm caused by Defendants' conduct is ongoing and continues to accumulate every day.

## II. PARTIES

2. Plaintiff Sherry Wilson is an individual residing in Iredell County, North Carolina, currently homeless due to Defendants' actions. She is a qualified individual with a disability receiving Social Security Disability Insurance (SSDI) benefits in the amount of $1,949 per month.

3. Defendant Partnership Property Management (PPM) is a North Carolina corporation with its principal place of business in Greensboro, North Carolina, doing business as the managing agent of The Flats at Statesville in Iredell County. PPM receives federal funds, making it subject to the Fair Housing Act and Section 504 of the Rehabilitation Act. PPM is one of the largest affordable housing managers in the Southeast, with approximately 310 apartment communities and nearly 14,000 units under management across North Carolina, South Carolina, Virginia, West Virginia, and Tennessee, and has been involved in the LIHTC program since its inception in 1986.

4. Defendant Jason Buffkin is an individual employed as PPM's Executive Vice President and is sued in his individual and official capacities. Buffkin holds the designation of Certified Property Manager (CPM) and is a licensed real estate broker – professional credentials reflecting advanced expertise in property management, fair housing compliance, and federal housing regulations. According to PPM's own website, Buffkin personally oversees PPM's Fair Housing compliance, 504 accommodation processes, and rehabilitation programs. Buffkin's professional credentials, combined with his direct oversight of these programs, make his claim that he was "unsure how your request is related to a disability" not merely implausible – it is a deliberate misrepresentation by a credentialed professional who knew or should have known exactly what Plaintiff's accommodation request required.

5. Defendant Drew Leonard is an individual employed as PPM's 504 Director and is sued in his individual and official capacities. Leonard granted Plaintiff a formal written credit waiver on October 17, 2025 as a reasonable accommodation under Section 504, then ignored all subsequent communications from Plaintiff despite having been copied on her emails and having left his only contact information as a phone number and mailing address.

6. Defendant Lisa Smith is an individual employed as PPM's Senior Regional Property Manager and is sued in her individual and official capacities. Operating from PPM's corporate office, Smith had no prior involvement in Plaintiff's application before November 21, 2025 – six days after Plaintiff's formal Spoliation and Evidence Preservation Notice was received by PPM on November 15, 2025. Smith's sudden appearance as a new point of contact following the spoliation notice reflects a coordinated effort to obstruct and retaliate. On November 21, 2025, Smith demanded October pay stubs for Uber and DoorDash – gig work Plaintiff had ceased on November 7, 2025 and which was never needed to qualify given Plaintiff's SSDI income. On December 5, 2025, Smith followed up threatening that if Plaintiff did not provide the requested documents by December 21, 2025, her case would be considered closed – all while Plaintiff had been homeless and sleeping in a vehicle for over three weeks.

7. Defendant Sabrina Warren is an individual employed as Site Manager at The Flats at Statesville and is sued in her individual and official capacities. Warren was the first point of contact in a coordinated pattern of discriminatory conduct. On September 22, 2025, Warren directed Plaintiff to cross out "SSDI" and write "SSI" on her application, deliberately misrepresenting Plaintiff's income source. Warren left the "Disabled" checkbox blank on the Ten-Day Notice to Applicant – a PPM form completed on September 22, 2025 – despite Plaintiff presenting her SSDI award letter. Plaintiff has never been provided a copy of her full application and cannot confirm what Warren recorded there, as PPM refused all requests for application copies. Warren directed Plaintiff and her adult dependent daughter to sign multiple documents simultaneously without explanation of what each document was or why signatures were required. Warren specifically directed her daughter to write down a different high school rather than her actual school, stating it would "make it easier." Plaintiff's daughter is an Early College student enrolled in a dual-degree program and is on track to graduate simultaneously with her high school diploma and an Associate in Science degree – an achievement Warren's instruction would have concealed from the official record. Warren's direction to falsify her daughter's school information mirrors her direction to Plaintiff to falsify her income source – a coordinated effort to manipulate the application record from the first moment of contact. On October 23, 2025, after the credit waiver had been granted, Warren called Plaintiff and declared her Uber Tax Summary unacceptable, claiming she had never seen it before, and stated that Plaintiff's previously accepted affidavits were wrong – creating new barriers to obstruct the processing of Plaintiff's approved application.

## III. JURISDICTION AND VENUE

8. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

9. This action arises under the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and supplemental state law claims.

10. Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district, and Defendants reside and conduct business in this district.

## IV. STATEMENT OF FACTS

**The Application and Same-Day Denial**

11. On September 22, 2025, Plaintiff submitted a housing application for a two-bedroom unit at The Flats at Statesville to Defendant Warren. At the time of application, Plaintiff disclosed her disability by presenting her SSDI award letter. Plaintiff did not request a reasonable accommodation on September 22, 2025, because she was not informed of her right to do so. Warren's deliberate failure to check the "Disabled" checkbox on Plaintiff's application concealed Plaintiff's disability status from the file and deprived Plaintiff of the notice she was

entitled to receive regarding her disability-related rights under the Fair Housing Act and Section 504. Had Warren properly documented Plaintiff's disability status, Plaintiff would have been notified of her right to request a reasonable accommodation at the time of application. It was not until after Plaintiff received the denial letter on September 25, 2025 and read the appeal instructions that she learned of the process. Plaintiff submitted her reconsideration and reasonable accommodation request on September 26, 2025.

12. During the application meeting, Defendant Warren:

- Left the "Disabled" checkbox blank on the Ten-Day Notice to Applicant despite Plaintiff presenting her SSDI award letter – a document Plaintiff has never been given a copy of her full application to verify;
- Told Plaintiff to cross out "SSDI" and write "SSI" – coercing Plaintiff to misrepresent her income source;
- Told Plaintiff to write a lower bank interest rate;
- Had Plaintiff's daughter, then 18 years old, sign 5–7 documents without explanation;
- Told Plaintiff's daughter to list a different high school.

13. Plaintiff emailed her documentation on September 22, 2025 at 10:26 PM to the Flats at Statesville email address. Defendant Warren was the Site Manager and primary contact for Plaintiff's application.

14. On that same day – September 22, 2025 – Defendant Warren issued a denial letter citing "credit history." The denial letter was dated September 22, 2025 and mailed September 23, 2025, before Plaintiff's 10:26 PM email with supporting documents could have been reviewed, proving the denial was predetermined.

15. That evening at 10:26 PM, Plaintiff emailed all requested documents along with additional documentation she proactively included in good faith: notarized self-employment affidavits, an IRS non-filing letter, an SSA-1099, DoorDash and Uber statements, and a hardship letter. The IRS non-filing letter and SSA-1099 were never specifically requested by Defendants – Plaintiff provided them voluntarily to demonstrate the verifiable, stable nature of her SSDI income and her complete transparency regarding her financial situation.

16. Plaintiff's SSDI income of $1,896 per month at the time of application exceeded the monthly rent by 3.5 times, providing stable and sufficient income to satisfy rental obligations. Plaintiff also informed Defendants that her gig income was supplemental only and could be treated as $0 for rent qualification purposes, consistent with HUD regulations.

**Appeals and Reasonable Accommodation Request**

17. On September 29, 2025 at 2:14 PM, Plaintiff mailed her appeal to PPM's Fair Housing department via certified mail from the Statesville post office. The package arrived at the Greensboro USPS Distribution Center on September 30 and stalled for five days with no

movement. On October 4, 2025, Plaintiff contacted USPS and filed Service Request #82369812. The package resumed transit on October 5 and was delivered to PPM's PO Box on October 7, 2025 at 10:17 AM. This experience directly informed Plaintiff's decision on November 5, 2025 to send legal packets to both PPM's physical corporate address and their PO Box – knowing from prior experience that the PO Box was unreliable.

18. On October 5, 2025, Plaintiff emailed PPM corporate, requesting copies of her application documents, an explanation for her daughter's signatures, and an update on her appeal. She explicitly invoked her right to a reasonable accommodation under the Fair Housing Act. PPM never responded.

19. On October 6, 2025, Plaintiff filed a fair housing complaint with HUD (Inquiry No. 853132).

20. On October 15, 2025, Plaintiff followed up with PPM, copying HUD. No response.

**Credit Waiver Granted**

21. On October 17, 2025, Defendant Leonard issued a 504 credit waiver as a reasonable accommodation for Plaintiff's disability, stating that credit – the sole disqualifying factor – was waived. The waiver removed the only barrier to Plaintiff's approval.

22. On October 20, 2025, Plaintiff mailed a certified letter to PPM corporate. That same day, she checked her mailbox and found the credit waiver letter from Defendant Leonard dated October 17, 2025. The credit waiver stated that the site manager would be in contact with Plaintiff regarding next steps. On October 22, 2025, in an act of good faith, Plaintiff emailed Defendant Leonard to thank him for the credit waiver and to inform him that he could disregard the certified letter she had mailed earlier that day – sent before she knew the waiver had been granted – as she believed Defendants were finally acting in compliance with the law. This communication demonstrates Plaintiff's continued good-faith efforts to work cooperatively with management. Plaintiff's good faith reliance on the credit waiver was met the very next day with Warren's October 23 demands.

**Post-Waiver Harassment and Retaliation**

**The October 23, 2025 Meeting: Intentional Breakdown of the Interactive Process**

23. On October 23, 2025, Plaintiff attempted to finalize her application following the October 17 credit waiver. Defendant Warren met Plaintiff with immediate administrative hostility, creating new, arbitrary barriers that did not exist prior to the granting of the 504 accommodation. This meeting constituted a deliberate, coordinated effort to shut down the interactive process required under the Fair Housing Act and Section 504.

24. Administrative Hostility and the Document Trap: Defendant Warren claimed the Uber Tax Summary was suddenly "unacceptable," despite this exact document having been in the file since September 22, 2025. This was a moving goalpost tactic: once the credit barrier was

removed by the waiver, Warren shifted to a documentation barrier to ensure the application remained stalled. These were the exact same affidavits Defendants had accepted and used as the basis for the September 22 denial. Warren had never notified Plaintiff of any deficiency in those documents during or after the initial application review and had never provided instructions on how to complete them correctly at the time of submission. Warren's sudden objection – raised only after the 504 Director granted a credit waiver – constitutes a classic shifting rationale and bad faith.

25. Coerced Falsification of Affidavit Records: Defendant Warren demanded that Plaintiff alter both of her two separate self-employment affidavits – one for DoorDash and one for Uber. Specifically, Warren demanded that Plaintiff remove "$0" for anticipated self-employment income over the next 12 months on each affidavit – a figure that was accurate and regulation-compliant under HUD guidelines – and demanded that Plaintiff remove her written comment from both affidavits. That comment stated that Plaintiff received SSDI in the amount of $1,896 monthly, that this income was sufficient to cover rent and all bills, and that she did not rely on gig work to cover any living expenses. Warren declared the comment "unnecessary" on both documents. Directing Plaintiff to remove truthful, material information from a sworn affidavit constitutes an attempt to coerce Plaintiff into misrepresenting her financial circumstances on a legal document, mirroring Warren's earlier instruction during the September 22 application to cross out "SSDI" and write "SSI."

26. The Hard Rejection – Refusal to Continue the Interactive Process: When Plaintiff proactively suggested utilizing TrueWork – a standard, industry-recognized third-party income verification platform – to resolve Warren's purported concerns about income documentation, Warren responded with a hard, emphatic head-shake and an audible vocalization of disapproval. This physical gesture was a definitive and deliberate shuttering of the interactive process required under Section 504. Warren's refusal to consider any alternative verification method – while simultaneously rejecting every document Plaintiff had already provided – created an impossible procedural loop designed to ensure the application could never be completed. Warren also offered to help Plaintiff fill out the affidavits in her private office. Plaintiff declined, given Warren's established pattern of directing Plaintiff and her household members to falsify application records. Plaintiff corrected the top section of the affidavits, which had contained a genuine error, while preserving her accurate $0 projected income and her clarifying SSDI comment.

27. On October 24, 2025 at 12:16 AM, Plaintiff emailed Defendant Leonard with the subject line "Attention: Mr. Drew Leonard – Request for New Point of Contact and Copy of My Application." In the email Plaintiff stated she did not wish to continue working with Sabrina Warren due to Warren's dismissive tone and mishandling of her application. Plaintiff noted that Warren had indicated the affidavits were completed incorrectly despite them having been reviewed without objection when initially submitted. Plaintiff stated she had requested a full copy of her application twice and had not received it. Plaintiff informed Leonard that she had

affidavits and income verification ready to provide once a new representative was assigned, and emphasized that her November 13 deadline was approaching and timely access to her application was critical. Plaintiff respectfully requested that all future communication be handled by Leonard or another designated representative rather than Warren. Leonard did not respond.

28. On October 28, 2025 at 11:12 AM, Plaintiff called Defendant Leonard directly and left a voicemail. Leonard did not return the call.

29. All of Plaintiff's October 2025 emails to Defendant Leonard were sent to the same corporate email address – info@partnershippm.com – that she had used since her initial contact with PPM and through which the October 17, 2025 credit waiver had been initiated and issued. Despite the credit waiver listing only a phone number and mailing address for Defendant Leonard, Plaintiff continued to use the corporate email address as it was the only digital contact channel available and had been the functional point of contact through which the waiver was originally processed.

30. After identifying Leonard as the 504 Director, Plaintiff specifically addressed all subsequent emails "Attention: Drew Leonard" to ensure proper routing. Defendants cannot claim non-receipt of Plaintiff's October emails through this address when that same address had previously produced a formal written credit waiver. Their failure to respond to these specifically directed communications – after having established the corporate email as a functional contact point – constitutes a deliberate and bad-faith breakdown of the interactive process, not a technical failure.

31. On October 29, 2025 – directly following Defendant Warren's October 23 in-person meeting in which she rejected Plaintiff's Uber Tax Summary, refused Truework, and directed Plaintiff to correct her affidavits – Plaintiff took immediate action to address every concern Warren had raised. Plaintiff emailed Defendant Leonard her final corrected and notarized self-employment affidavits for both DoorDash and Uber, an explanation letter citing HUD regulation 24 CFR 5.609(c)(1) to accompany the affidavits, August and September Uber pay summaries, and July through September DoorDash statements. Plaintiff proactively included the September 2025 statements – the most recent complete month of data available – even though Defendants had not specifically requested them, in an effort to resolve any remaining concerns about her income verification. Plaintiff explicitly invited Defendants to let her know immediately if any additional information or clarification was needed, and offered to drop off hard copies at the leasing office to prevent further unnecessary delays. Plaintiff received no response to her repeated requests for confirmation that her file was complete or for guidance on what additional documentation, if any, was required. Defendants made no request for additional information in response to this explicit invitation. The first response from any Defendant came on November 10, 2025 – three days after Plaintiff's 49-page legal packet was received at PPM's corporate headquarters on November 7 at 1:48 PM. That response was not a good faith request for

information – it was a demand for impossible documentation that Defendants knew could not be produced.

32. On October 31, 2025, Plaintiff emailed Defendant Leonard again, noting her lease ended November 14, 2025, and a unit was available. She asked for confirmation that her file was complete. He never responded.

33. Following the issuance of the credit waiver on October 17, 2025, Plaintiff made repeated good-faith attempts to contact Defendant Leonard – the 504 Director who had granted the accommodation – by phone and by email to report that Defendant Warren was refusing to process her file and was manufacturing new objections to previously accepted documentation. Defendant Leonard ignored every communication. He did not return Plaintiff's October 28 voicemail. He did not respond to Plaintiff's October 24 email requesting a new point of contact. He did not respond to Plaintiff's October 29 submission of corrected affidavits and supporting documents. He did not respond to Plaintiff's October 31 email confirming that a unit was available and her lease expired November 14. Defendant Leonard's only contact with Plaintiff after issuing the credit waiver was a voicemail left on November 10, 2025 – three days after Plaintiff's 49-page legal packet arrived at PPM's corporate headquarters. This silence in the face of an escalating housing emergency, followed by sudden engagement only after formal legal notice was received, constitutes deliberate indifference and a coordinated refusal to facilitate the non-discriminatory processing of Plaintiff's application.

**Complaints to State Agencies and Final Notice**

34. On November 1, 2025, Plaintiff filed a complaint with the North Carolina Human Relations Commission (NCHRC). On November 3, 2025, Plaintiff also filed a complaint with Disability Rights North Carolina (DRNC). On November 6, DRNC attempted a warm handoff to Legal Aid NC, but the referral did not go through because the required consent response was never received. On November 12, 2025, DRNC staff member Iris emailed Plaintiff confirming that the issues presented did not meet the criteria for disability discrimination under DRNC's mandate and that DRNC could not provide direct assistance. Iris stated she was consulting with DRNC attorneys to explore possible referrals. On November 13, 2025, DRNC sent Plaintiff a formal Reasonable Accommodation Request Letter and Protection Against Retaliation – the best assistance their attorneys could offer – which Plaintiff used to send a final formal notice to PPM that same day.

35. On November 4, 2025, Plaintiff sent a final written notice to PPM, giving them until November 7, 2025 to approve or deny her application. She also attached a Profit & Loss Statement showing $0 countable income per HUD rules. On November 7, 2025 at 6:19 PM – more than four hours after Plaintiff's 49-page legal packet had been delivered to PPM's corporate headquarters at 1:48 PM that same day – Defendant Buffkin replied to Plaintiff's November 4 email. Buffkin apologized for his delayed response, stating he had been out of the office. He said he would review Plaintiff's file with his team on Monday and that if PPM had made an

error they would correct it. Buffkin made no mention of the 49-page legal packet that had arrived at his corporate office earlier that afternoon. His email gave no indication that he was aware of or had reviewed the legal notice Plaintiff had sent documenting fraud allegations, fair housing violations, and a demand for immediate action.

**Legal Packet and Retaliatory Response**

36. On November 5, 2025, Plaintiff mailed two identical 49-page legal packets (timeline, emails, all documents) via certified mail, return receipt requested – one to PPM's corporate headquarters and one to their PO Box.

37. The corporate packet was delivered on November 7, 2025 at 1:48 PM. The return receipt green card was never returned to Plaintiff despite having been requested. At 6:09 PM that same day, Defendant Buffkin emailed Plaintiff for the first time – she had never heard of him before. He apologized, said he had been out of the office, and would review on Monday.

38. Also on November 10, 2025, both Defendant Leonard and Defendant Buffkin called Plaintiff from PPM's corporate line (336) 544-2300. Plaintiff did not answer either call. At 1:10 PM, Defendant Leonard left a 32-second voicemail stating he had received Plaintiff's packet in the mail that day regarding her "questions regarding your application at the Flats at Statesville" and asked Plaintiff to call him back at extension 266. This voicemail constitutes direct confirmation by PPM's own 504 Director that the legal packet was received – eliminating any claim that PPM did not receive Plaintiff's legal notice and fraud allegations. At 5:08 PM, Defendant Buffkin left a 35-second voicemail stating he was calling about Plaintiff's "email and application," that he had "several questions" about the information Plaintiff provided, and that "it seems like you've kind of made a profit and loss statement for yourself and so forth." Buffkin characterized Plaintiff's 49-page documented legal packet as a self-made profit and loss statement, demonstrating either deliberate dismissiveness or willful blindness to the serious legal notice Plaintiff had sent. Buffkin asked to get Plaintiff's "side of events" and to see what he could do to help.

39. On November 10, 2025, after reviewing Plaintiff's packet, Defendant Buffkin sent a hostile email demanding tax returns and four consecutive paystubs from Uber and DoorDash, which constituted unnecessary and unattainable documentation demands – records that did not exist because Plaintiff had only performed gig work for 3–4 months. He also wrote: "I am unsure how your request is related to a disability" – despite Plaintiff having disclosed her disability and SSDI, and despite a 504 credit waiver having already been granted.

40. Plaintiff did not open Buffkin's November 10 email until November 15, 2025. On November 10 she saw a preview of the email which contained no offer of housing, no approval, and no resolution. Plaintiff was in active crisis at the time – calling DSS, Goodwill, the Salvation Army, and anyone else she could reach trying to find help moving her household, funding for a U-Haul, and temporary shelter. Every agency told her they had no funds available. No one

could help her move. No one could help her find somewhere to stay. No one could provide money for a hotel or moving truck. Plaintiff and her 18-year-old daughter – whose Golden Birthday of turning 19 on December 19 would be spent homeless in a vehicle – were completely alone in trying to manage the logistics of homelessness while Defendant Buffkin sent emails demanding impossible documentation.

**Ongoing Leasing Activity Despite Plaintiff's Complete Application**

41. Throughout the period before Plaintiff applied, during the processing of her application, after her application was complete, and even after Plaintiff and her daughter became homeless, Defendants continued to lease units at The Flats at Statesville to other applicants.

42. While refusing to process Plaintiff's approved application, Defendants continued to advertise, show, and lease apartments to other individuals. Plaintiff took timestamped screenshots of Defendants' own website documenting units available during the period her application sat unprocessed, establishing that Defendants' failure to process her application was not due to lack of availability.

43. Defendants' ongoing leasing activity, combined with their refusal to act on Plaintiff's application, is direct evidence of discriminatory intent, retaliation, and bad-faith obstruction of Plaintiff's fair housing rights.

**Specific Intent of Corporate Officers**

44. Defendants Buffkin (Executive Vice President) and Leonard (504 Director) acted in concert to obstruct Plaintiff's housing. As high-level corporate officers with specialized training in Fair Housing compliance, their refusal to honor the October 17 credit waiver was not a clerical error, but a deliberate, coordinated effort to retaliate against a disabled applicant for exercising her protected rights.

**Actual Notice of Impending Harm**

45. Defendants Buffkin and Leonard were given actual notice of Plaintiff's impending homelessness on October 31, November 4, and November 13, 2025, all of which explicitly stated that Plaintiff's lease ended November 14 and that she had nowhere to go. In some of Plaintiff's earlier communications, November 13 was referenced due to uncertainty regarding whether she was required to vacate before or on the lease termination date. Regardless, Defendants were clearly informed that Plaintiff faced imminent homelessness no later than November 14, 2025. The educational disruption to Plaintiff's daughter, an Early College student enrolled in a dual-degree program, was a foreseeable and direct consequence of that homelessness that Defendants knew or should have known would result from their failure to act. By choosing to ignore these urgent communications, Defendants acted with callous indifference to the foreseeable harm their inaction would cause.

### Failure to Engage in the Interactive Process

46. Despite Plaintiff providing direct verification of her disability (SSDI) and requesting a reasonable accommodation, Defendants Buffkin and Leonard failed to engage in the mandatory "interactive process." Instead, Defendant Buffkin explicitly questioned the "relation to a disability" after the accommodation had already been granted, which constitutes a bad-faith obstruction of Plaintiff's civil rights.

### HUD 100-Day Rule – Lack of Notice of Impracticability

47. As of April 2026, more than 200 days have passed since the filing of the initial HUD complaint (No. 853132).

48. Plaintiff has received no "Notice of Impracticability" explaining the delay in investigation.

49. The referral to the NC Human Relations Commission resulted in a "Lack of Jurisdiction" dismissal that failed to address the federal LIHTC compliance issues at the heart of the complaint.

### Homelessness and Ongoing Harm

50. On November 13, 2025, Plaintiff sent a formal Reasonable Accommodation Request Letter and Protection Against Retaliation to PPM. The letter requested that her application be processed without unnecessary procedural barriers and that she be considered for the available 30% AMI 2-bedroom/1-bathroom unit. Plaintiff explicitly noted that previously approved documentation should be accepted unless there was a legitimate, nondiscriminatory reason for any change, and stated her concern that Defendants had reversed approvals and introduced new requirements after she disclosed that she receives SSDI – conduct she identified as potential retaliation and disability discrimination in violation of the Fair Housing Act and Section 504. Plaintiff advised PPM that her lease ended November 14 and that she was at risk of homelessness. PPM did not respond.

51. On November 14, 2025, Plaintiff's lease ended. She and her daughter, an Early College student who was 18 at the time and turned 19 the following month, became homeless. They have remained homeless for approximately six months.

52. Defendants' conduct constitutes a continuing violation of the Fair Housing Act. Plaintiff's injuries are ongoing, as she remains without stable housing as a direct result of Defendants' actions. Every day Plaintiff remains homeless because she was denied housing for which she was qualified is a new, ongoing injury caused by Defendants' original discriminatory and retaliatory acts.

53. Also on November 14, 2025, NCHRC Intake Specialist Evangeline Best emailed Plaintiff asking whether she had received follow-up from Legal Aid, Ms. Green, or Partnership Property Management. Plaintiff responded the same day confirming that Legal Aid could not help, that

DRNC had only provided a template letter, and that she had emailed that letter to PPM corporate on November 13. Plaintiff stated that PPM was still retaliating and holding her application hostage, that her application had been complete since October 17, that units were being rented out while her application sat in limbo, and that she and her daughter were now homeless. Plaintiff directly addressed Best's prior dismissal of the discrimination claim by stating: "I don't care how many properties they own or how big of a company they are – they shouldn't be allowed to knowingly discriminate against the disabled and engage in illegal activities. A reasonable accommodation such as the credit waiver they granted me and then blocked is useless when they won't honor it."

54. On November 15, 2025, while homeless in her car, Plaintiff read Buffkin's November 10 email. She immediately sent a legal notice demanding PPM preserve all evidence and told them to contact her only through an attorney. PPM ignored that instruction.

55. On November 21, 2025, Defendant Lisa Smith emailed Plaintiff demanding October pay stubs for Uber and DoorDash. Plaintiff had ceased all gig work on November 7, 2025, but had not informed PPM of this fact – meaning Smith was demanding documentation for income she had no reason to know had stopped. Regardless, the gig income documentation was never needed to qualify given that Plaintiff's SSDI of $1,896 per month covered the rent 3.5 times over and the credit waiver had already been granted. Smith also demanded an updated Profit and Loss Statement with a mileage log meeting IRS standards. PPM had never previously requested a P&L statement – Plaintiff had included one voluntarily in her November 5 legal packet because Defendants had refused to communicate with her or specify what documentation they needed. Having received no guidance despite repeated requests, Plaintiff was reduced to guessing at what might satisfy them, proactively including every document she could think of – including the P&L – in an attempt to break through the wall of silence. PPM took that voluntarily provided document and used it to manufacture a new and more burdensome requirement, demanding an "updated" version with IRS-standard mileage documentation. A mileage log meeting IRS standards is not a standard requirement for a $542 per month LIHTC apartment and was invented as a new requirement only after Plaintiff voluntarily provided a P&L statement. Plaintiff had no obligation to provide this documentation and it was entirely irrelevant to her qualification based on SSDI income alone. It is also notable that the NCHRC closure letter was dated November 20 and mailed November 21, 2025 – the same day Smith first appeared and sent her initial documentation demand. Plaintiff did not receive that closure letter until December 1, meaning she was unaware her NCHRC protection had been closed at the very moment Smith introduced new barriers.

56. On December 5, 2025 – just four days after Plaintiff received the NCHRC closure letter on December 1 and learned she had lost that avenue of protection – Defendant Smith sent a follow-up email giving Plaintiff until December 21, 2025 to provide the same unsupported documentation demands, threatening that Defendants would "consider the case closed" if she did not comply. Plaintiff was homeless and sleeping in a vehicle when this email was received.

**Loss of Milestones**

57. On December 19, 2025, Plaintiff's daughter turned 19 on her Golden Birthday – the rare occasion when your age matches your birth date. Plaintiff and Plaintiff's daughter's belongings remained completely inaccessible in a storage unit – packed floor to ceiling with beds and mattresses blocking everything – making it impossible to reach clothing or personal items. Since becoming homeless on November 14, 2025, Plaintiff and her daughter have had to purchase or order necessities because they cannot access anything they own. They ran errands and checked into a hotel room around 3:00 PM so that her daughter would not wake up on the morning after her birthday back in a vehicle. Plaintiff's son, a college student whose National Guard pay had been disrupted by a government shutdown, drove down and paid for Plaintiff's daughter's birthday meal and most of Plaintiff's because they were completely without funds. Plaintiff's legs were severely swollen during this period. The boots her daughter wore with her birthday dress had to be ordered from Amazon because her belongings were buried and inaccessible in storage. This was the direct and foreseeable consequence of Defendants' refusal to process a qualified application from a disabled woman who needed a $542 per month apartment.

**Interference with Education**

58. Plaintiff's daughter is enrolled in an Early College dual-degree program – a rigorous course of study that allows students to simultaneously complete high school and earn a full Associate in Science degree. She is scheduled to graduate on May 14, 2026 with both her high school diploma and her Associate in Science degree – an extraordinary academic achievement accomplished entirely while homeless. For multiple semesters during her homelessness, she has been forced to complete her homework and coursework from a car, a hotel, and in freezing weather conditions. Had Plaintiff been housed, Plaintiff's daughter's plan was to apply to a four-year university following graduation. Homelessness has disrupted that plan and derailed her educational trajectory at a critical moment in her academic life. The psychological trauma of trying to be a high-achieving student while living in a vehicle has caused severe emotional distress to both Plaintiff and her daughter.

**Physical Injury – February 19, 2026**

59. Plaintiff began experiencing progressive bilateral lower extremity swelling in December 2025. Plaintiff made an appointment for January 26, 2026 but had to cancel and reschedule. She rescheduled to February 3, 2026 and again had to cancel and reschedule. She finally attended her first appointment on February 19, 2026. The repeated cancellations were not due to neglect but to the practical barriers of homelessness – including lack of consistent access to basic hygiene facilities, making it impossible to present herself for medical care with basic dignity. Plaintiff was actively attempting to seek care throughout this period.

60. On February 19, 2026, a Nurse Practitioner documented clinical bilateral lower extremity pitting edema, noting that Plaintiff and her daughter had been living in their car since November, that Plaintiff was "unable to keep her legs elevated," and that her living situation was contributing to her worsening condition.

61. The provider diagnosed Housing Instability after Recent Homelessness (Z59.812) and Bilateral Lower Extremity Edema (R60.0), discontinued amlodipine, and initiated diuretics (Lasix).

62. Despite treatment, Plaintiff continues to experience persistent pitting edema that only temporarily resolves when lying flat for extended periods. Because Plaintiff is forced to sleep upright in the driver's seat with her legs dangling, the swelling returns daily.

63. Plaintiff also began experiencing numbness and tingling in her great toes within one to two weeks after she began sleeping in her vehicle following the onset of homelessness. Medical records dated February 19, 2026 document numbness in the bilateral great toes (ICD-10 R20.0), with slightly diminished sensation confirmed on monofilament examination. Plaintiff reported persistent numbness, greater in the right toe than the left, which continued for several months. Although the condition has improved, it has not fully resolved. Plaintiff had no prior history of this condition before becoming homeless, and the onset and progression of symptoms coincided with prolonged sitting, inability to elevate her legs, and restricted movement associated with living in a vehicle.

64. Plaintiff also experienced significant weight gain during the period of homelessness. Medical records from February 19, 2026 document that Plaintiff had gained approximately 20 pounds since October. This weight gain resulted from food insecurity, inability to maintain a consistent diet, lack of access to a kitchen, and reduced ability to engage in normal physical activity. Plaintiff had previously been actively managing her weight and health, and the gain exacerbated her existing symptoms, including lower extremity swelling and reduced mobility. The weight gain and associated limitations were a direct consequence of Plaintiff's living conditions and further contributed to her physical and emotional distress.

65. These injuries are a direct and foreseeable result of Defendants' actions.

**March 13, 2026 "Inactive/Incomplete" Letter**

66. On March 13, 2026, Defendants mailed Plaintiff a letter stating that her September 29, 2025 reasonable accommodation request was "incomplete" and had been placed on "inactive status."

67. This statement directly contradicts Defendants' prior written approval of Plaintiff's reasonable accommodation and credit waiver on October 17, 2025.

68. Plaintiff had already submitted all requested documentation, including final notarized affidavits and supporting financial records on October 29, 2025.

69. Plaintiff never withdrew her application or reasonable accommodation request at any time.

70. Although Defendants never issued a written revocation of the October 17, 2025 credit waiver, their conduct – demanding new documentation, treating the waiver as void, and refusing to process the application – constituted a functional and unlawful revocation. Defendants cannot shield themselves from liability by pointing to the absence of a written revocation while simultaneously acting as though the waiver never existed.

71. Defendants' March 13, 2026 letter attempts to characterize Plaintiff's application as incomplete despite their prior approval and subsequent failure to process the application.

72. The March 13, 2026 letter also referenced Plaintiff's daughter in connection with a failed credit check or co-applicant status. Plaintiff's daughter was a dependent household member, not a financially responsible applicant. Defendants never provided Plaintiff with application documents showing that her daughter was designated as a co-applicant. As a dependent student enrolled in Early College with no income and no employment, Plaintiff's daughter had no basis to be treated as a co-applicant. As of September 22, 2025, Plaintiff's daughter had zero credit history. Her first credit activity did not occur until October 13, 2025, her first payment was made in November 2025 by Plaintiff, and she had a 615 FICO score by December 2025. PPM's reference to Plaintiff's daughter's credit in a March 2026 letter – six months after the application and four months after Plaintiff became homeless – is a fabricated post-hoc justification designed to manufacture a basis for denial that never existed at the time of application. Additionally, the March 13, 2026 letter was mailed to Plaintiff's former address and had to be forwarded by USPS to her current PO Box, further demonstrating Defendants' awareness that Plaintiff had been displaced from her prior residence.

**April 14, 2026 Medical Necessity Letter**

73. On April 14, 2026, Plaintiff's treating medical provider issued a formal letter documenting that Plaintiff's chronic medical conditions qualify as disabilities under the Fair Housing Act and Section 504, and that stable, private, non-congregate housing is medically necessary. The letter was written to assist Plaintiff in securing future housing – not as a communication directed at PPM – because Plaintiff remains homeless and is still attempting to find housing elsewhere. The provider noted that Plaintiff's housing instability has made it difficult to maintain treatment routines, manage symptoms, and remain medically stable, and recommended that Plaintiff's housing application be prioritized and expedited as a reasonable accommodation. The need for this letter is itself a direct consequence of Defendants' conduct – Plaintiff would not need a medical necessity letter for future housing applications had she been housed at The Flats at Statesville as she was entitled to be.

74. Plaintiff's credit score, which she worked to improve from 534 in November 2025 to 601 by the time of filing, is now at risk of declining again because homelessness has depleted her financial cushion and she is being forced to rely on credit cards to meet basic needs. The financial

stability she worked to build while homeless is being eroded by the same circumstances PPM's conduct created. This ongoing credit damage directly interferes with Plaintiff's ability to qualify for housing elsewhere – meaning Defendants' original conduct continues to harm Plaintiff's housing prospects every day she remains homeless.

75. Defendants' conduct continues to harm Plaintiff's ability to secure housing. Her homelessness and resulting financial strain are ongoing and directly traceable to Defendants' actions. Every day Plaintiff remains homeless is a day of harm caused by Defendants' refusal to process a qualified application from a disabled woman who needed a $542 per month apartment.

**No Approval or Denial to Date**

76. To this day, PPM has never issued a formal approval or denial of Plaintiff's application. The credit waiver granted on October 17, 2025 has never been honored. Instead, Defendants retaliated against Plaintiff for filing fair housing complaints by revoking the waiver, continuing to impose unsupported and shifting documentation requirements, and failing to process Plaintiff's application.

## V. CLAIMS FOR RELIEF

### Count 1 – Disability Discrimination – Failure to Accommodate (42 U.S.C. § 3604(f)(3)(B))

Defendants granted Plaintiff a credit waiver as a reasonable accommodation, then functionally revoked it by treating the waiver as void and imposing impossible new documentation requirements. Defendants failed to engage in the mandatory interactive process required under the Fair Housing Act and Section 504, despite Plaintiff's repeated attempts to communicate and provide documentation. When Plaintiff proactively suggested using Truework, an industry-standard income verification platform, to resolve any purported ambiguity about her gig income, Defendant Warren emphatically shook her head no and made a low audible noise of disapproval, effectively shutting down the only available path to income verification that Plaintiff could offer. Defendant Buffkin's November 10 email questioning whether Plaintiff even had a disability – after the waiver had already been granted – further demonstrates that Defendants abandoned the interactive process entirely. This constitutes a failure to accommodate in violation of the Fair Housing Act. Defendants' refusal to honor the granted accommodation after issuing it constitutes a denial of a reasonable accommodation as a matter of law.

### Count 2 – Retaliation (42 U.S.C. § 3617)

Plaintiff engaged in protected activity by requesting a reasonable accommodation and filing complaints with HUD, NCHRC, and DRNC. Defendants took adverse actions against Plaintiff – revoking the approved credit waiver, imposing escalating documentation demands designed to prevent compliance, and ignoring her housing emergency – in direct retaliation for that protected activity. There is a clear causal connection between Plaintiff's protected activity and Defendants' adverse actions. Defendants' demand for October gig income pay stubs on November 10, 2025 –

made only three days after Plaintiff ceased all gig work and only after receiving her 49-page legal packet – constitutes a retaliatory moving goalpost tactic. Plaintiff had already provided complete documentation through September 30, 2025 without receiving any response. Plaintiff had already provided the most recent complete month of gig income data available at the time of her October 29 submission – September 2025 – which Defendants ignored entirely until legal action was threatened. By the time Defendants demanded October records on November 10, Plaintiff had ceased all gig work on November 7 – three days earlier. Demanding records for a month during which Plaintiff had stopped working, immediately after receiving formal legal notice, was not a good faith effort to verify income. It was retaliation designed to manufacture non-compliance where none existed. The temporal proximity between Plaintiff's protected activity and Defendants' adverse actions is unusually close, further supporting a direct causal connection.

### Count 3 – Interference with Fair Housing Rights (42 U.S.C. § 3617)

Defendants interfered with Plaintiff's exercise of her fair housing rights by obstructing her application, refusing to communicate, and creating endless new documentation requirements after her complaints. Defendants' conduct was designed to prevent Plaintiff from securing housing to which she was entitled.

### Count 4 – Section 504 of the Rehabilitation Act – Retaliation (29 U.S.C. § 794)

Defendants receive federal financial assistance and are subject to Section 504 of the Rehabilitation Act of 1973. Plaintiff is a qualified individual with a disability. Plaintiff engaged in protected activity by requesting a reasonable accommodation and filing complaints. Defendants took adverse action by revoking the approved accommodation and refusing to process Plaintiff's application. There is a direct causal connection between Plaintiff's protected activity and Defendants' adverse actions, and Defendants' retaliation caused Plaintiff substantial damages.

### Count 5 – Fraud / Fraudulent Inducement (North Carolina Common Law)

Defendants made false representations to Plaintiff, including coercing her to change "SSDI" to "SSI" on her application, issuing fraudulent and pretextual document demands, and representing that Plaintiff's application was under active review while taking no action. Defendants knew these representations were false or made them recklessly. Defendants intended Plaintiff to rely on these representations, and Plaintiff did so to her detriment, suffering homelessness and the other damages described herein.

### Count 6 – Intentional Infliction of Emotional Distress (North Carolina Common Law)

Defendants' conduct was extreme and outrageous, including coercing Plaintiff to falsify income documentation, revoking an approved reasonable accommodation immediately after Plaintiff filed protected complaints and four days before her lease expired, and causing Plaintiff and her daughter to become homeless and sleep in a vehicle in freezing temperatures for months. Defendants acted intentionally or recklessly. Defendants' conduct caused Plaintiff severe emotional distress,

including anxiety, panic attacks, chronic sleep deprivation resulting from the inability to sleep safely or deeply while living in a vehicle, exacerbation of disability-related conditions, and loss of dignity.

## Count 7 – North Carolina Unfair and Deceptive Trade Practices (N.C. Gen. Stat. § 75-1.1)

Defendants' conduct – directing Plaintiff to falsify application information, denying her on the same day she applied, granting then revoking a credit waiver, imposing arbitrary and shifting documentation requirements, and ignoring her while she became homeless – constitutes unfair and deceptive acts or practices in commerce. Defendant Warren's conduct toward Plaintiff's daughter during the application process – including directing her daughter to write a different school than the one she actually attended, stating it would "make it easier," and having her daughter sign multiple documents simultaneously without explanation – constitutes additional deceptive acts directed at a household member during a consumer housing transaction. These acts proximately caused injury to Plaintiff and her household. Defendants further engaged in unfair and deceptive practices by rejecting Plaintiff's Uber Tax Summary while intentionally withholding any information regarding what alternative documentation would satisfy the application requirements. This tactic – rejecting valid evidence while refusing to define what evidence would be acceptable – constitutes a deliberate effort to ensure Plaintiff's application could never be completed, trapping a qualified disabled applicant in an impossible procedural loop designed to manufacture grounds for denial. These acts occurred in the context of a consumer housing transaction and therefore fall squarely within the scope of N.C. Gen. Stat. § 75-1.1. These acts were in or affecting commerce, as required under N.C. Gen. Stat. § 75-1.1.

## Count 8 – Breach of the Implied Covenant of Good Faith and Fair Dealing (North Carolina Common Law)

Defendants' pattern of deception, obstruction, retaliation, and deliberate delay breached the duty of good faith and fair dealing inherent in the application and housing approval process. Defendants were given actual notice of Plaintiff's impending homelessness on October 31, November 4, and November 13, 2025, and deliberately engaged in "moving goalpost" tactics to ensure she could not secure the unit, showing a reckless disregard for the educational and physical well-being of Plaintiff and her daughter.

## Count 9 – Denial of Housing Opportunity (42 U.S.C. § 3604(f))

Defendants interfered with and effectively denied Plaintiff's opportunity to obtain housing by revoking a previously granted credit waiver, imposing barriers in the form of unsupported documentation demands, and refusing to process or finalize Plaintiff's completed application in a timely manner. As a result of Defendants' conduct, Plaintiff was deprived of housing for which she was otherwise qualified and suffered housing instability and homelessness.

## Count 10 – Negligence (North Carolina Common Law)

Plaintiff pleads this count in the alternative to all intentional tort claims. Defendants owed Plaintiff a duty of care as a housing applicant with a documented disability seeking a reasonable accommodation under federal and state law. Defendants breached that duty by failing to properly process Plaintiff's application, failing to review submitted documentation, failing to honor the credit waiver, and failing to communicate the basis for any continued documentation demands. As a direct and proximate result of Defendants' negligence, Plaintiff and her daughter suffered homelessness, physical injury, emotional distress, and ongoing financial harm.

## Count 11 – Constructive Denial of Housing (42 U.S.C. § 3604(f))

Under the Fair Housing Act, a failure to act on a completed application constitutes a constructive denial of housing. Defendants never issued a formal approval or denial of Plaintiff's application after the credit waiver was granted on October 17, 2025. Instead, Defendants imposed escalating documentation demands, went silent, and allowed Plaintiff's lease to expire – effectively denying her housing through deliberate inaction. This constructive denial was based on Plaintiff's disability and constitutes a violation of 42 U.S.C. § 3604(f).

## Count 12 – Negligent Infliction of Emotional Distress (North Carolina Common Law)

Defendants owed Plaintiff a duty of care to process her housing application fairly and in accordance with federal and state law, knowing she was a disabled applicant facing imminent homelessness. Defendants breached that duty by failing to communicate, rejecting valid documentation without specifying alternatives, refusing to honor the granted credit waiver, and allowing Plaintiff's lease to expire without acting. It was reasonably foreseeable that Defendants' failure to act would cause Plaintiff severe emotional distress. As a direct result of Defendants' negligence, Plaintiff suffered severe emotional distress, including the trauma of prolonged homelessness, physical manifestations of stress including bilateral lower extremity edema, anxiety, and the psychological harm of watching her daughter complete her academic achievements while homeless. Plaintiff pleads this count in the alternative to Count 6 (Intentional Infliction of Emotional Distress).

## Count 13 – Spoliation of Evidence

Defendants spoliated evidence by failing to preserve or return the certified mail return receipt ("green card") for Plaintiff's November 5, 2025 legal packet delivered to PPM corporate headquarters on November 7, 2025 at 1:48 PM, as confirmed by USPS tracking number 9589 0710 5270 2535 7203 51. USPS confirmed delivery but could not locate the green card after Plaintiff reported its absence. Defendants' failure to preserve this receipt deprives Plaintiff of direct documentary proof of the exact date Defendants received her fraud allegations and fair housing legal notice. The absence of the green card prevents Plaintiff from proving the exact date Defendants received her legal notice, which is central to establishing retaliatory intent. This spoliation prejudices Plaintiff's ability to establish the timing of Defendants' receipt and its causal

connection to their November 10, 2025 retaliatory demands. Plaintiff requests an adverse inference instruction at trial that the missing green card, if produced, would confirm timely receipt and would be unfavorable to Defendants.

## VI. ADDITIONAL SPOLIATION FACTS

77. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

78. On November 5, 2025, Plaintiff mailed two identical 49-page legal packets via Certified Mail with Return Receipt Requested – one to PPM's corporate headquarters at 4600 Dundas Drive, Greensboro, NC 27407, and one to PPM's PO Box at PO Box 26405, Greensboro, NC 27404.

79. The corporate packet was delivered on November 7, 2025 at 1:48 PM, as confirmed by USPS tracking. The return receipt green card for this corporate packet was never returned to Plaintiff despite being requested. The corporate packet was sent with certified mail tracking number 9589 0710 5270 2535 7203 51, confirmed delivered November 7, 2025 at 1:48 PM. The return receipt was registered under tracking number 9590 9402 7903 2234 0755 21 on November 5, 2025 at 3:28 PM, confirming it was properly requested and associated at mailing. Despite both being documented, the green card was never returned. Plaintiff contacted USPS to report the missing green card and spoke directly with a supervisor named Joel from the Westside NX post office on November 24, 2025 at 3:22 PM. Joel confirmed he could not locate the green card in tracking and stated he would need to speak with the carrier who delivered the packet. Joel never followed up after that conversation. The disappearance of the green card, confirmed by USPS's own inability to account for it, supports an inference of concealment of proof of early receipt of Plaintiff's fraud allegations and legal notice.

80. The P.O. Box packet was not delivered until November 17, 2025 – twelve days after mailing. The green card for this packet was signed on November 18, 2025 and received by Plaintiff on November 20, 2025. The delayed delivery of the P.O. Box packet, combined with the missing corporate green card, resulted in prejudice to Plaintiff's ability to prove the timing of Defendants' receipt of her legal notice and fraud allegations.

81. Defendants' spoliation of the return receipt evidence was intended to conceal the fact that PPM's corporate headquarters received Plaintiff's legal packet – containing fraud allegations and fair housing complaints – prior to Jason Buffkin's retaliatory email on November 10, 2025 demanding impossible documentation and claiming ignorance of Plaintiff's disability.

82. Defendants' spoliation prejudiced Plaintiff's ability to prove the causal connection between receipt of her legal notice and the retaliatory conduct that followed. Plaintiff is entitled to an adverse inference instruction at trial based on Defendants' spoliation of this evidence.

83. On November 15, 2025 at 8:14 AM, Plaintiff sent a formal spoliation notice to Jason Buffkin directing preservation of all emails, voicemails, call logs, internal records, and all copies of Plaintiff's application, waiver, and SSA-1099. Plaintiff also CC'd the North Carolina Human

Relations Commission at HRC.Complaints@oah.nc.gov on this notice — putting NCHRC on formal record that litigation was reasonably anticipated. Five days later, on November 20, 2025, NCHRC Intake Specialist Evangeline Best closed Plaintiff's case for lack of jurisdiction. The closure letter was dated November 20, mailed November 21, and not received by Plaintiff until December 1, 2025 — meaning Plaintiff did not know her case had been closed for eleven days. Defendants' failure to honor the spoliation notice and their continued obstruction constitutes willful spoliation of evidence.

## VII. REQUEST FOR RELIEF

Plaintiff requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, for:

A. A temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65, ordering Defendants to immediately cease all discriminatory and retaliatory conduct and to provide emergency financial relief sufficient to allow Plaintiff to secure safe, comparable housing without further delay, given that Plaintiff and her daughter have been homeless since November 14, 2025 as a direct result of Defendants' actions;

B. A permanent injunction enjoining Defendants from further discrimination and retaliation;

C. Compensatory damages for out-of-pocket losses (hotels, storage, moving expenses, application fees, lost wages, and all other economic harm), including loss of housing opportunity and loss of the benefit of the granted reasonable accommodation, in an amount to be determined at trial;

D. Compensatory damages for past and future emotional distress, including but not limited to:

    — The humiliation, fear, anxiety, and mental anguish of over six months of homelessness;

    — The loss of irreplaceable life milestones, including Plaintiff's daughter's 19th Golden Birthday;

    — Plaintiff's emotional distress from witnessing her daughter's educational disruption, derailed college applications, and loss of stability — including being forced to complete multiple semesters of Early College coursework from a vehicle and hotel — during homelessness caused solely by Defendants' actions;

    — The pain and suffering associated with Plaintiff's physical injury (pitting edema and circulatory issues);

    — All in an amount to be determined at trial;

E. Punitive damages to punish Defendants for their willful, malicious, and intentional conduct and to deter similar conduct in the future, in an amount to be determined at trial;

F. Attorney's fees, costs, and expenses under 42 U.S.C. § 3613(c)(2), N.C. Gen. Stat. § 75-16.1, and other applicable law;

G. Pre- and post-judgment interest;

H. An adverse inference instruction at trial that Defendants destroyed or concealed evidence of the delivery date of Plaintiff's November 5, 2025 legal packet to PPM corporate, and that such evidence would have been unfavorable to Defendants;

I. A mandatory compliance order requiring Defendants to issue a formal approval or denial of Plaintiff's application within 10 days of the Court's order, with a daily penalty of $5,000 per day for each day of non-compliance beyond that deadline;

J. A permanent injunction enjoining Defendants from engaging in disability discrimination, retaliation, or interference with fair housing rights against Plaintiff or any future applicant, and requiring Defendants to: (1) implement corrective fair housing compliance measures under court supervision; (2) submit to an independent audit of their application processing practices for applicants receiving SSDI, SSI, and other low-income and disability-based income sources, with particular attention to whether such applications were processed equitably compared to higher-income applicants; and (3) submit to an independent review of their PO Box and corporate mail handling procedures as they relate to fair housing correspondence, to determine whether systemic delays or failures in mail processing have prevented disabled, low-income, or minority applicants from exercising their fair housing rights;

K. Such other and further relief as the Court deems just and proper.

## VIII. JURY TRIAL DEMAND

Plaintiff Sherry Wilson demands a trial by jury on all issues so triable.

## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

I, Sherry Wilson, acting pro se, hereby certify that artificial intelligence tools were used to assist in the drafting of this document. As the pro se party making this filing, I have personally reviewed every statement, fact, and citation contained herein as to accuracy and affirm that all facts are true and correct to the best of my personal knowledge.

Dated: 05-05-2026

Respectfully submitted,

*Sherry Wilson*

Sherry Wilson, Pro Se
Homeless – Contact via Email/Phone
(704) 657-0567
Jayneleo37@yahoo.com